UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIMMY P. WILLIAMS,<br><br>   Plaintiff,<br><br> v.<br><br>JO ANNE B. BARNHART,<br><br>   Defendant. | No. C-06-1342 JCS<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND AFFIRMING THE DECISION OF THE SOCIAL SECURITY COMMISSIONER [Docket Nos. 7, 9]** |

## I. INTRODUCTION

Plaintiff, Jimmy P. Williams, filed a complaint seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability benefits under Title II of the Social Security Act. Plaintiff asks the Court to reverse the Commissioner's decision and remand the matter for further administrative proceedings.

Plaintiff applied for disability insurance benefits on April 8, 2004. The application was denied initially on May 14, 2004, and again upon reconsideration on June 18, 2004. Plaintiff made a timely request for a hearing, and a hearing was held on January 20, 2005, before an Administrative Law Judge ("ALJ") in Oakland, California. On March 11, 2005, the ALJ issued a decision finding Plaintiff was not disabled as defined by the Social Security Act and denying his request for benefits. The decision became final when the Appeals Council denied Plaintiff's request for review on December 19, 2005. Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).

Plaintiff filed a summary judgment motion on June 29, 2006, and the Commissioner, in turn, filed a summary judgment motion on July 31, 2006. Plaintiff filed his response to Defendant's

motion on August 14, 2006. The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

## II. BACKGROUND

### A. Plaintiff's Background

Plaintiff was born on March 17, 1953. Administrative Record ("AR") at 57. Plaintiff was 51 years old as of March 28, 2004, the alleged onset date of disability. *Id*. Plaintiff graduated from high school and completed two years of college to get his certification as a meat cutter. AR at 17, 184. After completing the certification program, he worked for American Foods, which became Lucky's, and then later Albertsons. AR at 185. Plaintiff has 30 years of past relevant work experience as a meat cutter. AR at 17, 216. His duties involved using power saws, butcher knives, meat slicers, meat grinders, lifting heavy items, and driving a forklift. AR at 72.

Plaintiff has not engaged in "substantial gainful activity" since March 28, 2004. AR at 24. Plaintiff stopped working at the recommendation of his optometrist. AR at 21.

### B. Medical Evidence

Plaintiff claims that he is disabled based on the following impairments: 1) keratoconjunctivitis sicca in both eyes (dryness of the conjunctiva and cornea); 2) diffuse keratitis (inflammation of the clear front covering the eye); 3) punctate keratitis (inflammation of the cornea characterized by small erosions of the tissue covering the cornea); 4) corneal pannus (scarring and vascularization of the cornea); and 5) age-related astigmatism (a condition that occurs when the cornea is slightly irregular in shape; and 6) presbyopia (a vision condition in which the crystalline lens of the eye loses its flexibility, making it difficult to focus on close objects). AR at 17, 112. The medical evidence consists primarily of records from Plaintiff's optometrist, Rahul Keswani, and records from three ophthalmologists who treated or examined Plaintiff: Dr. Ra-Chel Jordan-Moore, Dr. A. Alan Weber, and Dr. Philip Levy.

#### 1. Mr. Keswani and Dr. Jordan-Moore

According to Mr. Keswani, he has been Plaintiff's optometrist since around 1994 and has seen Plaintiff once or twice a year since that time. AR at 122. On August 27, 2002, Mr. Keswani wrote a letter to Plaintiff's employer stating that "due to an ocular condition, Mr. Williams has

2

extreme difficulty in both daytime and night-time driving" and requesting that Plaintiff be placed in a work location "that requires minimal driving time (5-10 minutes)." AR at 123.

On February 7, 2004, Mr. Keswani referred Plaintiff to the Kaiser ophthalmology department, noting that Plaintiff suffered from "<u>extreme</u> photophobia." AR at 127. The referral contained the notation: "Restasis?" AR at 127.

On February 11, 2004, Dr. Jordan-Moore, of the Kaiser Ophthalmology department, examined Plaintiff. AR at 117. She diagnosed him with "severe keratoconjunctivitis sicca" and recommended that he "[t]ry punctal plugs [and] hold on the Restasis."[1] AR at 127. On Dr. Jordan-Moore's advice, Plaintiff had two punctal plugs inserted, but his condition did not improve. AR at 83, 199.

On March 27, 2004, in a consultation form that apparently was prepared in support of Plaintiff's disability claim or his Workers Compensation claim, Mr. Keswami described Plaintiff's condition as follows:

> Mr. Williams has [and] currently suffers from <u>extreme</u> light sensitivity likely from fluorescent lighting in his workplace of over 30 years. This light sensitivity has caused permanent organic [and] visual damage. Consults by specialists have proven to be of minimal benefit. In my opinion Mr. Williams must refrain from any eye-hand activities that compromise his well-being. In my opinion Mr. Williams suffers from permanent disability because of these ocular problems.

AR at 116.

On September 1, 2004, Dr. Keswani wrote a letter to Plaintiff's attorneys in which he described Plaintiff's history as follows:

> Mr. Williams has been a patient of our office for over the past 7 years. During that time he has developed multiple and recurrent eye infections in both eyes. These infections have attempted to be treated by conventional treatments including antibiotics lubricating drops, and punctal plugs. Mr. Williams has also been referred to numerous ophthalmologists who have tried their own forms of treatment. Unfortunately these treatment modalities proved to be of no improvement to Mr. Williams ocular situation.

---

[1] Punctal plugs are used to "stop the normal drains which carry tears away from the eye, so that an eye which is receiving sub-normal tear production will remain well-lubricated." AR at 18.

> Due to the fact that Mr. Williams current occupation as a butcher requires intricate eye-hand coordination it is in my opinion that his general health is in risk. The recurrent infections have caused diminished visual acuity and exposure to conventional fluorescent lighting seems to exaberate [sic] the condition. Mr. Williams condition whch [sic] is currently being diagnosed as severe keratoconjunctivitis sicca causes severe hyperemia (redness) and corneal irritation which causes a reduction in visual accuity of 20/25 right eye, 20/40 left eye. It is very likely that 30 years of fluorescent light exposure along with a family history of poor light sensitivity contributed to the current problem. It is in my opinion that Mr. Williams should no longer proceed in his current occupation due to his ocular situation.

AR at 148.

### 2.    Dr. Weber

On July 30, 2004, Dr. A. Alan Weber conducted a medical examination as part of Plaintiff's Workers' Compensation claim. AR at 153. Dr. Weber's clinical diagnosis was as follows: "Bilateral conjunctival hyperemia, left eye greater than right eye. Left corneal pannus inferiorly. Ocular surface disease, left eye." AR at 154. He also listed the following "subjective factors of disability": "1) Decrease focusing and diminished vision. 2) Headaches, intermittent in the region of the temples associated with reading invoices occurring 2-3 times per week and relieved with three Advils or Tylenol Extra Strength. 3) Sensitive to light requiring wearing sunglasses constantly." AR at 154. In his discussion of Plaintiff's diagnosis, Dr. Weber stated:

> It is my opinion that the applicant has had ocular surface disorder in the left eye dating back to January 1999. There are no medical records indicating a previous history of ocular surface disorder in the right eye. My examination failed to reveal any pathology involving the right cornea.

AR at 156.

Dr. Weber "strongly disagree[d]" with Mr. Keswani's opinion that Plaintiff's ocular problems were caused by his exposure to fluorescent lighting at his workplace and described as "nonsense" Mr. Keswami's suggestion that Plaintiff has a "familial history of fluorescent light sensitivity." AR at 156-157. Dr. Weber also expressed the opinion that there was "significant magnification of [Plaintiff's] photophobic symptoms particularly with regard to his right eye." AR at 157. However, he acknowledged that there "is an indication for photophobic symptoms" in Plaintiff's left eye. AR at 157.

4

### 3. Dr. Levy

On October 4, 2004, Dr. Philip L. Levy conducted a Qualified Medical Examination of Plaintiff. AR at 159. Dr. Levy diagnosed Plaintiff with the following conditions: severe keratoconjunctivitis sicca in both eyes; marked diffuse keratitis of the left eye due to decreased tearing; inferior superficial punctate keratitis of the left eye, worse than the right; ocular surface disorder of the left eye, worse than the right; minimal corneal pannus of the left eye; marked irregular astigmatism of the left eye, with minimal irregular astigmatism on the right; hysterical visual fields defect; mild hyperopic astigmatism of both eyes; and presbyopia of both eyes due to aging. AR at 167. Plaintiff's corrected vision was 20/40 on the right and 20/70 on the left. AR at 165.

Dr. Levy concluded that Plaintiff's complaint of blurred vision in both eyes was due to his "reduced tearing and ocular surface disease." AR at 167. He further noted that Plaintiff's complaint of loss of "depth field" and "peripheral vision" was due to the loss of visual acuity caused by his dry eyes. AR at 167. He stated that Plaintiff's complaint that he is unable to focus quickly is caused by age-related presbyopia. AR at 167. He noted that Plaintiff's inability to read for any significant period was because he was wearing two-year old progressive bifocals. AR at 168. Dr. Levy believed that Plaintiff would be able to read normally if he were to wear single vision reading glasses. AR at 168. Dr. Levy remarked that Plaintiff complained of eye infections that occur every two to three weeks, for which he takes Tobradex drops, but noted that the prescription bottle Plaintiff brought with him to the appointment had been filled almost two years before. AR at 160.

Dr. Levy agreed with Dr. Weber that Plaintiff's condition was not caused by his exposure to fluorescent lighting. He also believed that Plaintiff "seem[ed] to exaggerate the severity of the glare's effects on his activities." AR at 170. He noted that he had difficulty evaluating Plaintiff's extraocular motility because Plaintiff "[kept] closing (squinting) his eyes almost closed because of what he says is his photophobia most of the time . . . even after my surreptitious installation of Opthaine topical anesthetic in each eye." AR at 166. He also concluded that Plaintiff's complaint that he could only drive in the middle of the day and was bothered more by artificial light than

sunlight was "not physiological," noting that "[g]lare and photophobia symptoms should and almost always are at their worst in sunlight and especially in the middle of the day." AR at 169.

### C. The Hearing

The ALJ held an administrative hearing on Plaintiff's claim for disability insurance benefits on January 20, 2006. Plaintiff appeared with his lawyer, and testimony was offered by medical expert Richard Lieurance, M.D., and vocational expert Richard Belchick, Ph.D. The hearing commenced with testimony by the medical expert concerning Plaintiff's condition. AR at 190-204. Dr. Lieurance expressed the opinion that Plaintiff's "subjective complaints . . . are not in keeping with his degree of visual acuity." AR at 190. Dr. Lieurance further noted that "[Plaintiff] has [keratoconjunctivitis] sicca , and nothing else, which is dry eyes, and nothing else has ever really been established." AR at 190. Dr. Lieurance acknowledged that Plaintiff's condition would likely cause some photosensitivity. AR at 201. However, he testified that in view of Plaintiff's "visual acuity" he would not consider Plaintiff to be totally disabled because "there are a lot of things that could be done." AR at 201. On the other hand, he testified that "[t]here is no question" that Plaintiff's condition gave rise to "limitations." AR at 202.

Dr. Lieurance stated that the best remedy for Plaintiff was to lubricate his corneas, that is, use eye-drops. AR at 202. He noted, however, that "the treatment by ophthalmologists for dry eye stinks." AR at 195. He explained. "[w]e're trying to irrigate the corneas with saline like solution, and they don't last very long, 20 to 30 minutes, and then the drops have to go in again. But ordinarily, when the drops are in, the visual acuity is all right. In other words, it is improved. If you put oil, or you put any other substances, long acting ointments or what have you, they work wonderfully. The only problem is they blur the vision worse than what the patient was complaining about." AR at 195. Later in the hearing, however, Dr. Lieurance testified that there are "new drops now . . . that are really working very well [and] which last two to four hours." AR at 202. Dr. Lieurance also testified that Plaintiff's ability to read would be better if he used single vision reading glasses instead of the graduated bifocal that Plaintiff testified he used for reading. AR at 210.

Next, Plaintiff testified about the impact of his impairment on his day-to-day activities. AR at 204-215. He testified that he has difficulty reading because his eyes soon become blurred. AR at

205. Although he uses lubricants, he has found that they "work for a little bit" and then stop being effective. AR at 205. He stated that at the time of the hearing, he was using a steroidal medication called Tobradex, which he had brought with him to the hearing. AR at 205. According to Plaintiff, his doctor didn't want him to take Tobradex because it is steroidal, but it was his "last resort" and the "only thing that works." AR at 214. Plaintiff testified that his eyes had gotten worse in the last two years and that he had difficulty reading computer screens. AR at 208. He also testified that he had slow reactions with respect to focusing and that he cannot drive at night because of the effect of headlights and traffic lights on his vision. AR at 212-213. During the day, Plaintiff drives only in the middle of the day. AR at 213.

Finally, the vocational expert testified. AR at 215-227. First, he testified that Plaintiff's former job as a meat cutter is considered by OSHA to be hazardous and would be more hazardous to an individual with impaired vision. AR at 218-219. He further testified that Plaintiff would be unable return to his job as a meat cutter if he needed to take frequent breaks to use eye drops. AR at 219-220. In particular, the following exchange occurred:

> ALJ: If I were to find that this man had visual problems . . . . Let's call it problems. I can't say efficiency or acuity because you've heard testimony to that. Let's call it problems, and these visual problems, for whatever reason, required that he had to stop using his vision occupationally about once an hour for a period of time a few minutes to put in medication, to close his eyes and rest for five minutes or 10 minutes, and then he wasn't *in communicado*. He just couldn't use his vision for five or 10 minutes while he put in some kind of drops or whatever, and then he could go back to work. . . . Could he continue to do the job of being a meat cutter/butcher?
>
> VE: Not as the job is generally done in the national economy. That is not to say if you owned your own company you couldn't run it any way you wanted to. But as the job is generally done in the national economy, you do not absent yourself from the job for whatever reason, and medication is just one of the reasons. It would be the same thing for anything else. You just cannot absent yourself from the job frequently throughout the work day, and be successfully employed as the jobs are generally done in the national economy.
>
> ALJ: And what about the fact that this is a – let me rephrase that. Is this necessity to be on the job without absenting yourself that you're talking about. Does that have any relation to the level of the skill that a job is?
>
> VE: I think so but I'm not sure I can prove it. I think the higher up the skilled scale you go, the more leeway one can have, only because there are fewer of those kinds of people around, generally speaking. But that doesn't legislate against the fact that even highly skilled people have to do the job for which they are paid.

AR at 220-221. Subsequently, the ALJ posed the following hypothetical:

> ALJ: . . .if I have in front of me a hypothetical worker who is 52 years old, and has a high school education, and some fairly extensive trade education. And who is literate, who is physically healthy in all respects, except that his vision is frequently blurred, and that he has – let's put it this way. That he has frequent difficult in fine focusing on things like print or small things the size of print. Is there any work a worker like that can do in our economy, whether it uses the skills he has or not, because he has no exertional limitations. So he has impaired vision to the level that you have blurriness in your vision at [times][2]?

AR at 223. The vocational expert answered:

> VE: Well, I expect at the unskilled level there might be. I think we could argue the point. I'm thinking primarily of something like an information clerk, or a lobbying guard, or something like that. But even when I've said that, there are occasions where you have to be able to be visually alert. . . .

AR at 223. Later, the ALJ questioned the vocational expert about the demands of working as a grocery store stocker, particularly, whether such a job would require normal visual acuity. AR at 224. The vocational expert testified that it would, noting that stockers must read instructions off a list and be able to read the labels on the shelves showing where the products are to be placed. AR at 225.

### D. The ALJ's Five-Step Analysis and Findings of Fact

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is only found disabled if her physical or mental impairments are of such severity that she is not only unable to do his previous work but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The claimant bears the burden of proof in

---

[2] In the transcript of the hearing, the word "fine" is used here. It is clear from context – and from the fact that the transcript continues numerous obvious mistranscriptions of this sort – the word used was "times" and not "fine." For the convenience of the reader, the Court has corrected these errors when quoting the record. In doing so, the Court does not change the meaning of the quoted passages.

8

1  establishing a disability. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881
2  (1996).

3        The Commissioner has established a sequential five-part evaluation process to determine
4  whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a). At Step One,
5  the Commissioner considers whether the claimant is engaged in "substantial gainful activity." 20
6  C.F.R. § 404.1520(a)(4)(I). If he is, the Commissioner finds that the claimant is not disabled, and
7  the evaluation stops. If the claimant is not engaged in substantial gainful activity, the Commissioner
8  proceeds to Step Two and considers whether the claimant has "a severe medically determinable
9  physical or mental impairment," or combination of such impairments, which meets the duration
10 requirement in 20 C.F.R. § 404.1509. An impairment is severe if it "significantly limits [the
11 claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the
12 claimant does not have a severe impairment, disability benefits are denied at this step. If it is
13 determined that the impairments are severe, the Commissioner will next perform Step Three of the
14 analysis, comparing the medical severity of the claimant's impairments to a compiled listing of
15 impairments that the Commissioner has ratified as disabling. 20 C.F.R. § 404.1520(a)(4)(iii). If one
16 or a combination of the claimant's impairments meet or equal a listed impairment, the claimant is
17 found to be disabled. Otherwise, the Commissioner proceeds to Step Four and considers whether the
18 claimant, in light of his impairments and residual functional capacity ("RFC"), can still perform
19 work he has performed in the past. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can still perform
20 previous work, he is found not to be disabled. If the claimant cannot perform past relevant work, the
21 Commissioner performs the fifth and final step of the analysis. 20 C.F.R. § 404.1520(a)(4)(v). At
22 Step Five, the burden shifts to the Commissioner to show that the claimant, in light of his
23 impairments, age, education, and work experience, can adjust to other work in the national economy.
24 *See Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995). A claimant who is found able to make the
25 adjustment to other work is not considered disabled, and will not receive disability benefits. 20
26 C.F.R. § 404.1520(f).

27       The ALJ in this case found that Plaintiff satisfied Step One because he had not engaged in
28 any substantial gainful activity since the onset of his alleged disability, March 28, 2004. AR at 17.

At Step Two, the ALJ concluded that Plaintiff had demonstrated a "severe" impairment on the basis of his bilateral conjunctivitis. AR at 17.

At Step Three, the ALJ found that Plaintiff's visual impairments do not meet or equal one of the Listings of Impairments found at 20 C.F.R. Part 404; Appendix 1. Because there are no listings that match Plaintiff's condition, the ALJ proceeded to Step Four. AR at 17-18.

At Step Four, the ALJ defined Plaintiff's RFC as being able to "perform all work, with the exception of extra hazardous work requiring fine differentiation, and with the requirement that he be allowed to stop working briefly approximately once every hour to apply eye drops." AR at 24. In reaching this conclusion, the ALJ relied on the medical evidence provided by treating ophthalmologist Dr. Ra-Chel Jordan-Moore and examining ophthalmologists Dr. A. Alan Weber and Dr. Philip Levy. AR at 22. The ALJ concluded that all of Plaintiff's physicians "agree that, with the use of single vision reading glasses, he should have no difficulty reading." AR at 22. The ALJ rejected Mr. Keswani's opinion that Plaintiff was totally disabled on the basis that it was not supported by medically acceptable clinical and laboratory diagnostic techniques and was inconsistent with other significant evidence in the record. AR at 21. He also found that Plaintiff's "complaints are far in excess of what the objective findings on examinations reveal" and that "despite allegations of disabling ocular symptoms, the medical evidence of treatment consists primarily of care by his optometrist." AR at 22. With respect to Plaintiff's need to apply eye drops, the ALJ found the time it would take was not "vocationally significant." AR at 22. In particular, he stated, "[t]he process is rather brief, no longer than it takes to remove a small bottle from one's pocket, tilt one's head back and apply eye drops to each eye, recap the bottle and put it away." AR at 22.

At Step Five, the ALJ determined that Plaintiff would be able to perform "all work, with the exception of extra hazardous work requiring fine differentiation, and with the requirement that he be allowed to stop working briefly approximately once every hour to apply eye drops." AR at 23. This RFC, the ALJ concluded, would allow Plaintiff to perform "virtually the full range of work." AR at 23. The ALJ noted that Plaintiff could work as a grocery store stocker and that while this was only "one tiny field," there were "many others existing in significant numbers in both the regional and

national economy." AR at 23. Therefore, the ALJ concluded that Plaintiff was not disabled. AR at 24.

### D.  Alleged Errors by the ALJ

Plaintiff asserts that the ALJ erred at Step Four with respect to determination of his RFC and at Step Five with respect to the finding that sufficient alternative jobs exist in the national economy given Plaintiff's RFC. Motion to Remand. Plaintiff raises the following specific issues:

1. Was the ALJ's assessment of Plaintiff's subjective complaints based on factual error and improper legal standard?

2. Was the ALJ's finding that Plaintiff had the visual capacity to perform all work except extra hazardous work, requiring fine differentiation based on substantial evidence?

3. Was the ALJ's finding that the time it took for Plaintiff to treat his dry eye condition during the work day was so brief as to be vocationally insignificant, based on substantial evidence?

4. Did the ALJ include all of Plaintiff's functional limitations in the hypothetical posed to the VE?

5. Did the ALJ meet his burden of proof by showing that specific alternative jobs exist in significant numbers?

## III.  ANALYSIS

### A.  Legal Standard

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence means "more than a mere scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir.1988). Even if the Commissioner's findings are supported by substantial evidence, they should be set aside if proper

legal standards were not applied when weighing the evidence and in reaching a decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978). In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

### B.  The ALJ's Rejection of Plaintiff's Subjective Complaints

In determining Plaintiff's RFC, the ALJ did not find that Plaintiff's subjective complaints were "convincing or credible," stating that "his complaints were far in excess of what the objective findings on examinations reveal" and also pointing to the fact that he had been treated mainly by his optometrist rather than by opthamologists. AR at 22. In addition, the ALJ cited to specific medical evidence in the record indicating that Plaintiff may have exaggerated some of his symptoms. The Court concludes that the reasons offered by the ALJ are clear and convincing and are supported by substantial evidence.

Where a claimant has produced medical evidence of an underlying impairment, the Commissioner may reject a claimant's testimony regarding his symptoms only on the basis of "clear and convincing" reasons, supported by specific findings. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995); *see also Thomas v. Barnhart*, 278 F.3d 947, 959-60 (9th Cir. 2002) (holding that ALJ's findings are entitled to deference if they are "properly supported by the record" and are "sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony" regarding his subjective symptoms). Here, the ALJ offered several specific reasons in support of his conclusion that Plaintiff's subjective complaints were exaggerated.

First, he noted that he found the opinions of the physicians who examined Plaintiff to be "the most reliable" and pointed out that Plaintiff's testimony that his eyes were more irritated by artificial light than sunlight was contradicted by "all of the physicians." AR at 22. Although not all of the doctors who examined or treated Plaintiff expressly addressed this issue, Dr. Levy stated in his report that glare and photophobia symptoms should be worst in sunlight and on that basis questioned Plaintiff's claim that sunlight bothers him less than artificial light. AR at 169. In his decision, the ALJ specifically cited Dr. Levy's comments on this issue. AR at 20, 22.

1   Second, the ALJ cited to the opinion of Dr. Weber that Plaintiff exaggerated the severity of
2 glare's effect on his activities. AR at 22. In fact, Dr. Weber expressly stated that he believed that
3 there was "significant magnification" of Plaintiff's photophobic symptoms. AR at 157.

4   Third, the ALJ pointed to Dr. Weber's observation that although Plaintiff stated that he
5 experienced eye infections every two to three weeks, the prescription of Tobradex, which he uses to
6 treat these infections, had been filled almost two years before. AR at 22. The ALJ could reasonably
7 have questioned Plaintiff's credibility regarding the severity and frequency of Plaintiff's eye
8 infections on the basis of this evidence.

9   The Court concludes that the ALJ offered sufficient reasons in support of his credibility
10 determination, which is entitled to deference.

### C.     The ALJ's Finding Regarding Plaintiff's Visual Acuity

Plaintiff asserts that the ALJ erred in concluding that he has sufficient visual acuity to perform "all work, with the exception of extra hazardous work requiring fine differentiation." In particular, he points to three "assumptions" on the part of the ALJ regarding his visual acuity that he asserts are erroneous: 1) the ALJ's statement in the decision that Dr. Levy's visual acuity test was "unreliable" (AR at 21); 2) the ALJ's conclusion that single reading glasses would improve Plaintiff's best correct vision; and 3) the ALJ's alleged assumption that "singular reader ocular glasses cure ocular disease." The Court concludes that the ALJ's determination regarding Plaintiff's visual acuity is supported by substantial evidence and therefore upholds that determination.

"In assessing a claimant's RFC, an ALJ considers all relevant evidence of record, such as medical source statements, the claimant's medical history, the clinical signs and laboratory findings, the medical treatment, and the claimant's activities." *Magallanes v. Bowen*, 881 F.2d 747, 752-53 (9th Cir. 1989); C.F.R. § 404.1520(e); Social Security Ruling 96-8p. Where it is uncontradicted, the opinion of an examining physician may be rejected only for clear and convincing reasons. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). On the other hand, where the opinion of the physician is not in conflict with the ALJ's RFC, no reasons need be given. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999).

Here, the ALJ concluded that "claimant does have diminished visual acuity with sensitivity

1  to bright lights." AR at 22. He found, though, that Plaintiff should have no difficulty reading if he
2  were to use single vision reading glasses and that his photosensitivity could be "reduced with
3  polarizing glasses." AR at 22. On this basis, the ALJ concluded that Plaintiff's only limitation with
4  respect to visual acuity was that he could not perform an extra hazardous job that requires fine
5  differentiation. This conclusion is supported by substantial evidence.

6  First, although Dr. Levy determined that Plaintiff's best corrected vision was 20/40 in the
7  right eye and 20/70 in the left eye, he nonetheless attributed Plaintiff's inability to read more than a
8  page at a time to his use of two-year old bifocals. AR at 168. Dr. Levy stated that single vision
9  reading glasses would be helpful "since he would be able to see clearly at his normal reading
10 distance through any part of the single vision reading lenses." AR at 168. He also recommended
11 "stronger single vision reading glasses," which he believed "should improve his vision after his
12 corneas clear from his superficial punctate keratitis (SPK) caused by his dry eyes." AR at 170. This
13 opinion was supported by medical expert Dr. Lieurance at the hearing. AR at 210-211. Although
14 Dr. Levy qualified his statement that stronger reading glasses would improve Plaintiff's vision *after*
15 his SPK cleared up, he did not qualify his earlier statement indicating that single vision glasses
16 would allow Plaintiff to "see clearly at his normal reading distance." The Court concludes on this
17 basis that the ALJ could reasonably conclude that Plaintiff single vision reading glasses will allow
18 Plaintiff to read normally.

19 Second, the Court is not persuaded by Plaintiff's assertions that the ALJ improperly rejected
20 Dr. Levy's determination that Plaintiff has diminished visual acuity. Although the ALJ stated at one
21 point in his decision that the visual acuity test conducted by Dr. Levy was not reliable, *see* AR at 21,
22 he ultimately accepted Dr. Levy's determination that Plaintiff's best corrected vision was 20/40 on
23 the right and 20/70 on the left. *See* AR at 20 (stating that Dr. Levy "found claimant's best corrected
24 vision to be 20/40 on the right and 20/70 on the left"), 22 ("I find that the physicians who have
25 commented on the claimant's condition are the most reliable. All of them find that claimant does
26 have diminished visual acuity"). Indeed, in describing Plaintiff's limitations, the ALJ described
27 Plaintiff as having "diminished visual acuity." AR at 22. The ALJ, however, believed this problem
28 could be addressed with eye-drops, single vision reading glasses and polarized glasses. AR at 22.

Because the RFC is not in conflict with Dr. Levy's visual acuity test results, the ALJ was not required to provide clear and convincing reasons for rejecting that opinion.

Finally, the Court finds no support for Plaintiff's assertion that the ALJ believed that use of single vision reading classes would cure his ocular disease. The ALJ does not express such an opinion in his decision. Rather, he states that Plaintiff's vision problems are "*correctable* to visual acuity sufficient for most work except for extra hazardous work requiring fine differentiation." AR at 22. (emphasis added).

### D. ALJ's Determination re Application of Eye Drops

Plaintiff asserts that the ALJ erred in concluding that application of eye drops will be effective in treating his condition, that is, that use of such drops on an hourly basis will take care of his vision problems and that his vision will immediately clear up upon application of the drops. He cites, in particular, to the testimony of medical expert Dr. Lieurance and to statements by Dr. Levy concerning the difficulties associated with treating ocular disease. *See* AR at 171 (Dr. Levy states that "[o]cular surface disease can be very challenging to treat may progress even with the most advanced treatment known to man at present"); AR at 202 (Dr. Lieurance testifying that saline-based drops may last only 20-30 minutes). The Court upholds the ALJ's determination that Plaintiff's condition can be treated with eye drops, including his finding that the limitation relating to application of eye-drops is not "vocationally significant."

The ALJ is the fact-finder, and may make reasonable inferences logically flowing from the record. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982). If the evidence is susceptible to more than one "rational interpretation," the ALJ's decision must be upheld. *Andrews v. Shalala*, 53 F.3d 1035, 1040 (9th Cir. 1995). Although both Dr. Levy and Dr. Lieurance acknowledged the shortcomings of existing treatments for ocular disease, each one also expressed the opinion that the appropriate treatment for Plaintiff's condition is eye-drops and further, that newer eye-drops "are really working well." AR at 202 (Dr. Lieurance); *see also* AR at 170 (Dr. Levy states that "I agree with Dr. Weber that the applicant has ocular surface disease, moderately severe, which deserves vigorous treatment with newer lubricants as well as anti-inflammatory drugs such as ocular

1  cyclosporine (Restatis)").[3]  The Court concludes that the ALJ's determination that Plaintiff's

2  condition can be adequately treated with regular application of eye-drops was reasonable.

3      Further, the Court finds to be reasonable the ALJ's determination that application of eye-

4  drops was not "vocationally significant" because they may be inserted in a very brief time.  First,

5  Plaintiff conceded in his Reply that "the process of applying the drops is very brief."  Second, there

6  is no evidence in the record suggesting that Plaintiff would require additional time for his eyes to

7  clear or for the drops to take effect, as suggest by Plaintiff's counsel.  Indeed, although both Dr.

8  Lieurance and Dr. Levy addressed the shortcomings of drops, including the sometimes short

9  duration of their effectiveness, neither one of them testified that the drops were not immediately

10 effective *when applied*.  The ALJ could reasonably have concluded, based on their testimony, that

11 the drops were effective immediately.

### E.    ALJ's Finding at Step Five that Sufficient Jobs Exist in the National Economy that Plaintiff Can Perform

14     Plaintiff asserts that the ALJ did not meet his burden at Step Five of showing that Plaintiff

15 can engage in other substantial gainful work that exists in the national economy, given his RFC.

16 The Court concludes that although the ALJ's reasoning was flawed at this step, his errors were

17 harmless.

18     Where a claimant suffers from only exertional impairments, the ALJ may rely on the Medical

19 Vocational Guidelines ("the Grids") outlined in 20 C.F.R. Part 404, Appendix 2 to make a

20 determination that substantial work is available to the claimant.  Where a claimant suffers from non-

21 exertional impairments, however, "the ALJ must determine how much the claimant's work capacity

22 is further limited by non-exertional restrictions."  *Allen v. Sec'y of Health and Human Servs.*, 726

23 F.2d 1470, 1472 (9th Cir. 1984) (citing 20 C.F.R. pt. 404, subpt. P. app. 2. § 200.00(e)(2)).  In

---

[3] The Court notes that Dr. Jordan-Moore advised on February 26, 2004 that Plaintiff should "try punctal plugs [and] hold on the Restasis."  AR at 127.  The Court is not persuaded by Plaintiff's assertion that this single notation means that Restasis is "not available" to Plaintiff.  Rather, it indicates that Dr. Jordan-Moore believed Plaintiff should try punctal plugs *before* trying Restasis.  Given that the punctal plugs, by Plaintiff's own admission, failed to relieve Plaintiff's symptoms, the later opinions of the examining physicians that Plaintiff should try Restasis do not conflict with Dr. Jordan-Moore's earlier notation.

particular, the ALJ must support his finding with evidence from a vocational expert.  *See Allen v. Sec'y of Health and Human Servs.*, 726 F.2d 1470, 1472 (9th Cir. 1984).  The testimony of the vocational expert, in turn, is sufficient only if it is in response to a hypothetical that accurately reflects the Plaintiff's RFC.  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006) ("in hypotheticals posed to a vocational expert the ALJ must only include those limitations supported by substantial evidence. . . .  Conversely, an ALJ is not free to disregard properly supported limitations).  An ALJ's error may be harmless in a social security case "where the mistake was nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion." *Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1055 (9th Cir. 2006).

Here, the ALJ cited to both the Grids and the VE's testimony as evidence in support of his finding at Step Five that Plaintiff is not disabled.  On the basis of this evidence he found that Plaintiff could work as a grocery stocker as well as "many  other[] [jobs] existing in significant numbers in both the regional and national economies." AR at 23.  The ALJ's reliance on the Grids was improper.  As noted above, reliance on the Grids is appropriate only when a claimant does not have non-exertional impairments.  The ALJ himself acknowledged that at the hearing that "we're miles from the Grid."  AR at 225.

The ALJ also erred to the extent he relied on the VE's testimony regarding the requirements of working as a grocery stocker. First, this testimony was given in response to a hypothetical that did not accurately reflect the ALJ's ultimate conclusions regarding Plaintiff's RFC: although the RFC places only very narrow restrictions on Plaintiff's ability to work, precluding Plaintiff *only* from performing "extra hazardous work requiring fine differentiation," the hypothetical included a more significant limitation that the individual's vision is "frequently blurred [and] he has frequent difficulty in fine focusing on things like print . . ." AR at 223.  The ALJ should have posed a hypothetical that was consistent with his ultimate findings regarding Plaintiff's RFC – findings the Court has already concluded were supported by substantial evidence.  Second, although the VE's testimony can reasonably be construed to state that an individual with the characteristics described by the ALJ could work as a grocery stocker, the ALJ failed to elicit any testimony from the VE that such jobs were actually available in the regional or national economy.

Notwithstanding these shortcomings, the Court concludes that these errors were harmless based on other testimony from the VE regarding the availability of jobs that supports the ALJ's decision. Specifically, when asked whether there was "any work a worker [like the one in the ALJ's hypothetical] can do in our economy," the VE answered that "there might be" and "we could argue the point," pointing specifically to the positions of information clerk or lobby guard. AR at 223. The ALJ could reasonably have construed this testimony as supporting the conclusion that there is work available in the national economy that Plaintiff can perform. Further, although the testimony was offered in response to a hypothetical that did not completely match Plaintiff's RFC, the fact that the limitations in the hypothetical were significantly greater than those included in Plaintiff's RFC, which were quite minor, supports the conclusion that if the ALJ had posed a hypothetical that more accurately reflected the RFC, the ALJ's testimony would not have been different. Accordingly, the Court concludes that ALJ's errors at Step Five were harmless.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's motion for summary judgment. The Court affirms the ALJ's decision that Plaintiff is not disabled.

IT IS SO ORDERED.

Dated: March 8, 2007

JOSEPH C. SPERO
United States Magistrate Judge